ESTATE OF VIRGINIA I. HUMBERT, DECEASED, PHILIP J. O'CONNELL AND F. KING TIEDEMAN, COEXECUTORS, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF RALPH H. HUMBERT, DECEASED, PHILIP J. O'CONNELL AND F. KING TIEDEMAN, COEXECUTORS, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7147–75, 7148–75.    Filed July 18, 1978.

*Thomas D. Graves,* for the petitioners.
*Roger D. Osburn,* for the respondent.

## OPINION

FEATHERSTON, *Judge:* Respondent determined the following deficiencies in petitioners' Federal estate tax:

| *Petitioner* | *Deficiency* |
|---|---|
| Estate of Virginia I. Humbert | |
| docket No. 7147–75........................................ | $14,256.29 |
| Estate of Ralph H. Humbert | |
| docket No. 7148–75........................................ | 196,885.60 |

The sole issue[1] for decision is whether petitioners are entitled to deductions under section 2055(a)[2] for charitable remainder interests in property transferred in trust by decedents Virginia I. Humbert and Ralph H. Humbert.

All the facts are stipulated.

Virginia I. Humbert (hereinafter Virginia) died on January 25, 1971, and Ralph H. Humbert (Ralph), her husband, died 2 days thereafter. The coexecutors of each estate, Philip J. O'Connell and F. King Tiedeman, both legal residents of the State of Florida, filed Federal estate tax returns with the Southeast Service Center, Chamblee, Ga.

## 1. *Trust Provisions*

On September 5, 1969, Ralph and Virginia created identical but separate trusts naming the Massachusetts Trust Co., Boston, Mass., as trustee. At that time, Ralph and Virginia each transferred certain Freedom Fund, Inc., shares to their respective trusts. The trust agreements provided that the trusts were to be governed by and construed according to the laws of the State of Massachusetts. By their separate wills executed on November 3, 1969, Ralph and Virginia devised and bequeathed the residue of their respective estates to their separate trusts.

From September 5, 1969, until their deaths, Ralph and Virginia were each entitled to receive monthly from their respective trusts an amount equal to 0.5 percent of the principal thereof. This amount was to be satisfied out of the trusts' net income and principal. In addition, Ralph and Virginia were entitled to withdraw further amounts of principal from their trusts subject to certain limitations not relevant to the issue here to be decided.

Under the terms of their trusts, if the donor's spouse was

---

[1] Petitioner Estate of Ralph H. Humbert in its petition claimed an overpayment of estate tax in the amount of $1,038.41. The issue relating to this amount, however, was conceded by petitioners on brief.

[2] All section references are to the Internal Revenue Code of 1954, as in effect at the time of the decedents' deaths, unless otherwise noted.

living on the date of the donor's death, the principal of the deceased donor's trust was to be divided into two separate equal trusts, referred to as the "Donor's Spouse's Trust" (DST) and the "Donor's Family Trust" (DFT). The trustee was to pay, at least semiannually, the entire net income from the DST and DFT to the surviving spouse during his or her lifetime.[3]

Upon the death of the surviving spouse, the principal of the DST trust was to be added to the principal of the DFT trust and administered under sections 2.1 of the respective trust agreements. Under those sections, the trustee was to pay to Martha Irene Humbert (hereinafter Martha), Ralph's unmarried sister, on December 31 of each year thereafter the lesser of $10,000 or the income from each trust. Any income not paid to Martha was to be added to principal. In addition, "part or all of the principal" could be paid to her "or applied for her benefit but only in such amounts as the Trustee deems necessary in its discretion."[4] On Martha's death, the principal was to be equally distributed to the following six named charities:

(1) Florida Sheriffs Boys Ranch
(2) All Childrens Hospital Children's Service Fund
(3) Stephens College Learning Center
(4) Carnegie University Endowment Fund
(5) The Salvation Army
(6) American Cancer Society Florida Division

Since Ralph died 2 days after Virginia's death without exercising any rights under Virginia's trust, a disclaimer of his

---

[3]The trust instrument, in addition, authorized the trustee to distribute to the surviving spouse so much of the DST principal as he or she—

"from time to time requests in writing, and in case of * * * [his or her] illness or incapacity * * * , such additional amounts of the principal may be paid to * * * [him or her] or applied for * * * [his or her] benefit * * * as the Trustee deems necessary in its discretion."

With regard to the DFT, the trust instruments provided that—

"At any time part or all of the [DFT] principal * * * may be paid to * * * [Ralph or Virginia] or applied for * * * [his or her] benefit * * * but only in such amounts as the Trustee deems necessary in its sole and uncontrolled discretion for all purposes."

[4]The text of sec. 2.1 of each trust agreement, containing the discretionary distribution provision is, in pertinent part, as follows:

"On December 31 of each year after the death of the survivor of the Donor and the Donor's spouse, the Trustee shall pay to (MISS) MARTHA IRENE HUMBERT, sister (sister-in-law) of the Donor, of 1147 Fifth Street, Lorain, Ohio, if she is then living, the sum of $10,000 annually or all the net income, whichever is less. * * * At any time after the death of the survivor of the Donor and the Donor's spouse, part or all of the principal may be paid to said MARTHA or applied for her benefit but only in such amounts as the Trustee deems necessary in its discretion."

interest in the trust was deemed to have been made under section 2055(a).[5] The DST principal in Virginia's trust was added to the DFT principal and administered under section 2.1 of the trust instrument.

In late 1972, the petitioner-executors, Martha, the trustee, and the six named charities agreed to reform and amend the decedents' trust agreements by changing the charitable remainder interests to "charitable remainder unitrusts" in the form contemplated by the pertinent 1969 Tax Reform Act provisions, discussed below. On December 28, 1972, the Court of Pinellas County, State of Florida, entered orders so amending the original trust agreements.

On their estate tax returns, Virginia's estate and Ralph's estate claimed charitable deductions under section 2055(a) in the respective amounts of $46,624.14 and $605,560.76 for the remainder interests transferred in trust to the six charities. In the notices of deficiency, respondent determined that these deductions were not allowable under section 2055 because at decedents' deaths the value, if any, of the bequests which ultimately would be received by the charities was not ascertainable.

## 2. *Statutory Framework*

The statutory framework for testing respondent's determination that the claimed deductions are not allowable is extremely complicated. Section 2055(a) provides that in the determination of the value of the taxable estate, a deduction, commonly called the charitable deduction, is allowed for the "amount of all bequests, legacies, devises, or transfers" to or for the use of, among other organizations, "any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes." The parties agree that each of the six designated charities, listed above, is the kind of organization referred to in this definition. There is no dispute on that point.

---

[5] Sec. 2055(a) states in pertinent part:

For purposes of this subsection, the complete termination before the date prescribed for the filing of the estate tax return of a power to consume, invade, or appropriate property for the benefit of an individual before such power has been exercised by reason of the death of such individual or for any other reason shall be considered and deemed to be an irrevocable disclaimer with the same full force and effect as though he had filed such irrevocable disclaimer.

For decedents dying *before* January 1, 1970, section 20.2055–2(a), Estate Tax Regs., provides in general that:

If a trust is created * * * for both a charitable and a private purpose, deduction may be taken of the value of the charitable beneficial interest only insofar as that interest is presently ascertainable, and hence severable from the noncharitable interest.[6]

Section 2055(e)(2)(A),[7] added by the Tax Reform Act of 1969 (hereinafter TRA), Pub. L. 91–172, sec. 201(d)(1), 83 Stat. 560, however, provides that for these split gifts to qualify in part as charitable contributions, the remainder interest must be in a trust which is "a charitable remainder unitrust [described in section 664]" or in some other specified form not pertinent here.[8]

These TRA provisions were made generally effective in the case of decedents dying after December 31, 1969. However, Congress recognized that these changes in the law could work a hardship where charitable gifts had been planned and made under prior law. To alleviate this hardship, individuals, generally speaking, were given a grace period during which the TRA provisions would not apply. The TRA provisions did not apply to property transferred in trust on or before October 9, 1969, if the

---

[6]Where the charitable beneficial interest is in the form of a remainder in trust subject to invasion by the trustee in favor of the private life beneficiary, there is a further provision that "no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible." Sec. 20.2055–2(b)(1), Estate Tax Regs.; *Third National Bank & Trust Co. v. United States*, 228 F.2d 772, 773 (1st Cir. 1956). Since we hold the "presently ascertainable" requirement of sec. 20.2055–2(a), Estate Tax Regs., has not been met, we need not deal with that further provision.

[7]SEC. 2055. TRANSFERS FOR PUBLIC, CHARITABLE, AND RELIGIOUS USES.

(e) DISALLOWANCE OF DEDUCTIONS IN CERTAIN CASES.—

(2) Where an interest in property (other than an interest described in section 170(f)(3)(B)) passes or has passed from the decedent to a person, or for a use, described in subsection (a), and an interest (other than an interest which is extinguished upon the decedent's death) in the same property passes or has passed (for less than an adequate and full consideration in money or money's worth) from the decedent to a person, or for a use, not described in subsection (a), no deduction shall be allowed under this section for the interest which passes or has passed to the person, or for the use, described in subsection (a), unless—

(A) in the case of a remainder interest, such interest is in a trust which is a charitable remainder annuity trust or a charitable remainder unitrust (described in section 664) or a pooled income fund (described in section 642(c)(5)), * * *

[8]In general terms—

"A unitrust is a trust which specifies that the income beneficiary is to receive annual payments based on a fixed percentage of the net fair market value of the trust's assets, as determined each year." S. Rept. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 423, 481. For a more precise definition, see sec. 664(d)(2).

decedent died before October 9, 1972, unless the trust instrument was amended in the meantime.[9] During this interim period, the pre-January 1, 1970, rules would continue to apply.

The Treasury Department also recognized that the stricter TRA requirements could create inequities unless some provision was adopted for allowing amendments to be made to conform certain trusts with the TRA provisions. To ameliorate the TRA provisions during the transitional period, the Treasury Department issued section 1.664–1(f)(3), Income Tax Regs., authorizing amendments of trusts to conform them with the TRA unitrust or other applicable requirements. That regulation provided that, with regard to property transferred to a trust created "subsequent to July 31, 1969, and prior to December 31, 1972, which is not a charitable remainder trust at the date of its creation," the trust could be amended at any time prior to December 31, 1972, to meet the requirements of "a charitable remainder trust."[10] Such amendment would relate back to the date the trust was created.[11]

Subsequently, on October 26, 1974, Congress added section 2055(e)(3) to the Code, further authorizing the amendment of certain trust agreements. In pertinent part, that section as then adopted, reads as follows:

In the case of a will executed before September 21, 1974, or a trust created before such date, if a deduction is not allowable at the time of the decedent's death because of the failure of an interest in property which passes from the decedent to a person, or for a use, described in subsection (a), to meet the requirements of subparagraph (A) of paragraph (2) of this subsection, and if

---

[9] Pub. L. 91–172, sec. 201(g)(4)(C) (Dec. 30, 1969), 83 Stat. 565 (amending Code sec. 2055(e)), provides, in part, as follows:

(C) Such amendments shall not apply in the case of property transferred in trust on or before October 9, 1969—

(i) if the decedent dies before October 9, 1972, without having amended after October 9, 1969, the instrument governing the disposition of the property,

(ii) if the property transferred was an irrevocable interest to, or for the use of, an organization described in section 2055(a), or

(iii) if the instrument governing the disposition of the property was not amended by the decedent before October 9, 1972, and the decedent is on such date and at all times thereafter under a mental disability to change the disposition of the property.

[10] As defined in sec. 1.664–1(a)(1)(iii)(a), Income Tax Regs., a "charitable remainder trust" is "a trust with respect to which a deduction is allowable under * * * section 2055 * * * and which meets the description of a * * * charitable remainder unitrust."

[11] There is some dispute between the parties as to whether the Sept. 5, 1969, transfer of Freedom Fund shares is to be treated differently from the transfers by decedents' wills, i.e., whether the Oct. 9, 1969, date specified in the TRA or the July 31, 1969, date used in the transitional regulations control. As we view the issue, the answer must be the same for both sets of transfers.

the governing instrument is amended or conformed on or before December 31, 1975, * * * so that the interest is in a trust which is * * * a charitable remainder unitrust (described in section 664), * * * a deduction shall nevertheless be allowed. The Secretary or his delegate may, by regulation, provide for the application of the provisions of this paragraph to trusts whose governing instruments are amended or conformed in accordance with this paragraph * * * [12]

### 3. Effectiveness of the December 28, 1972, Reformation of the Trust Agreements

The parties agree that the post-death, December 28, 1972, reformation of the trust agreements conformed them with the charitable remainder unitrust requirements of section 2055(e)(2)(A). Petitioners point out that, as provided in section 2055(e)(3), decedents' trusts were created before September 21, 1974, and the trust agreements were amended before December 31, 1975, to conform them with the charitable remainder unitrust requirements. Accordingly, petitioners maintain, they are entitled to the coveted deductions.

Respondent answers that the post-death reformation of the trusts did not qualify the remainder interests for the deduction because the value of the charitable beneficial interest was not "presently ascertainable" under section 20.2055–2(a), Estate Tax Regs., at decedents' deaths. His argument is that both the transitional regulations and section 2055(e)(3) apply only where the remainder interests met the deductibility requirements of pre-TRA law at the time of decedents' deaths. He maintains neither the transitional regulations nor section 2055(e)(3) was intended to allow an estate, after the decedent's death, to create a deductible charitable interest unless such an interest existed under pre–1969 law.

We think respondent has the better side of the argument.

Under pre–1969 law a trustee of a split private-public interest trust could invest in high-income, high-risk assets and thereby

---

[12]After describing the problem of adjusting trusts to the TRA provisions, S. Rept. 93–1063, 93d Cong., 2d Sess. (1974), 1974–2 C.B. 448, 449, which accompanied this provision, stated:

"To help alleviate this problem, the Treasury Department issued regulations which provide additional transitional rules allowing a trust to qualify if the governing instrument is amended by December 31, 1972. However, because of the complicated nature of the statutory and regulatory requirements, many trusts were unable to make the necessary conforming amendments by December 31, 1972. As a result, the committee believes that the period allowed to make the required changes should be extended, thereby increasing the funds that will be available to many charities."

In 1976, this provision was amended by substituting Dec. 31, 1977, for Sept. 21, 1974, and Dec. 31, 1975.

increase the value of the private income interest to the detriment of the public charitable remainder. In order to eliminate this opportunity for the manipulation of trust investments and to assure a "closer correlation between the charitable contributions deduction allowed for a gift of a remainder interest to charity and the benefit ultimately received by the charity" (S. Rept. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 423, 479), Congress in 1969 enacted section 2055(e)(2)(A) which allows deductions only for split private-public interest trusts which are in one of the forms (including charitable remainder unitrusts) described therein.

Many existing as well as subsequently created trusts met the pre–1969 law requirements for charitable remainder trusts but did not meet the stricter TRA section 2055(e)(2)(A) requirements. The initial 3-year grace period during which the TRA provisions were made inapplicable was intended to allow these trusts to make the necessary changes. Nothing in the statutory language, quoted in part in note 9 *supra*, or its accompanying legislative history suggests any congressional intent to relax the pre–1969 requirements for charitable contributions.

As to section 2055(e)(3), it authorizes trust amendments where a deduction is not allowable "because of the failure of an interest in property * * * to meet the requirements" of section 2055(e)(2)(A). In such circumstances, post-death trust amendments were permitted. But deductions under the instant trusts not only fail to qualify because of the section 2055(e)(2)(A) requirements, but, for the reasons discussed below, they fail to meet the pre–1969 law deduction requirements. Section 2055(e)(3), as we read it, was not intended to authorize post-death amendments where the remainder interest would not have qualified as a charitable deduction had section 2055(e)(2)(A) not been enacted. See S. Rept. 93–1063, 93d Cong., 2d Sess. (1974), 1974–2 C.B. 448; S. Rept. 94–938, 94th Cong., 2d Sess. (1976), 1976–3 C.B. (Vol. 3) 57, 638.

The transitional regulation, sec. 1.664–1(f)(3), Income Tax Regs., authorizing amendments to existing trusts, similarly must be read in the light of the congressional policy of enabling taxpayers to conform their wills and trusts to the TRA provisions. Nothing in this regulation or the purpose it was designed to serve reflects an intention to allow post-death, retroactive amendments to qualify remainder interests for

deduction as charitable contributions if they did not so qualify under pre–1969 law. Otherwise, we would be required to attribute to the Treasury Department an intent, for example, to give a taxpayer an option to allow his executors and trustees, after the decedent's death, to amend the trust conforming it with the TRA or to retain provisions permitting unbridled invasion of the trust corpus for the benefit of the remainderman. We do not think such post-death estate planning was intended.

Indeed, the Treasury Department has issued regulations (Temporary Regs., sec. 24.1, T.D. 7393, 1976–1 C.B. 283), dealing specifically with this issue. In substance, they provide that the right to make such amendments is limited to trusts which qualified under pre–1969 law. They stated that if "At the time of the decedent's death a deduction is not allowable *solely* because of the failure of an interest in property which passes or has passed from the decedent to a person, or for a use, described in section 2055(a) *to meet the requirements of section 2055(e)(2)(A)* [emphasis added]," a charitable deduction will nonetheless be allowed if the governing instrument is amended to meet the requirements of the section. Those regulations further provide that—

a governing instrument *may not be amended* pursuant to this section *unless*, at the time of the decedent's death, the interest is an irrevocable remainder interest for which a deduction, *but for section 2055(e)(2)(A)*, would be allowable under section 2055(a) and the regulations thereunder. [Emphasis added.]

The preamble to these temporary regulations states they apply "to any interest for charitable purposes which passes under a will executed before September 21, 1974," and "to inter vivos transfers created after July 31, 1969, which are irrevocable at the date of death." It is clear, therefore, that these temporary regulations apply in the instant case.

We think these temporary regulations reflect a permissible interpretation of the statute and are valid. *Commissioner v. South Texas Co.*, 333 U.S. 496 (1948); *Taylor v. Commissioner*, 67 T.C. 1071, 1077 (1977). They are consistent with the legislative intent to protect charitable deductions to which estates would have been entitled but for the enactment of the 1969 Reform Act. They do not reflect any intention to allow all estates to have the privilege of reforming trust instruments which would not have qualified even if the 1969 Act had not been adopted. Accordingly, unless the charitable remainder interests provided

for the six designated charities were deductible under pre–1969 law, such interests were not rendered deductible by the post-death amendments.

### 4. *The Standard for Invasion of the Trusts' Corpora*

The deductibility of the charitable remainder interests under pre–1969 law depends on whether decedents' trust instruments prescribed an ascertainable standard for invasion of the corpus. That turns on whether the remainder interests were severable from the noncharitable interests and the amounts which will reach the charities were accurately calculable as of decedents' deaths. If so, the deduction is allowable. Otherwise, it is not. The standard for invasion of the trusts' corpora was contained in that provision that "part or all of the principal may be paid to said MARTHA or applied for her benefit but only in such amounts as the Trustee deems necessary in its discretion."

In broad outlines two Supreme Court decisions illustrate what is and what is not an ascertainable standard for invasion of a trust's corpus. In *Ithaca Trust Co. v. United States,* 279 U.S. 151, 154 (1929), invasion of principal was authorized to pay the widow what "may be necessary to suitably maintain her in as much comfort as she now enjoys." The Court held that this language provided a definite and ascertainable standard to guide the trustee in making invasions of the corpus, i.e., the standard of living to which the widow was accustomed. On the other hand, in *Merchants Bank v. Commissioner,* 320 U.S. 256, 258 (1943), the Court reached the opposite conclusion where the power permitted invasion for the widow's "comfort, support, maintenance, and/or happiness." The Court emphasized the impossibility of defining what might be required for a woman's "happiness" and, consequently, what would be the value of the ultimate gift.

Our study of the trust instruments in the instant case in the light of the controlling Massachusetts law convinces us that they did not prescribe an ascertainable standard for invasion of the corpus and hence the value of the charitable remainders could not be valued as of the dates of the decedents' deaths.

As we read the trust instruments the trustee was authorized to invade the corpora of the trusts for any purpose which was for Martha's benefit. The extent to which the invasion could be made was the amount deemed "necessary" by the trustee, i.e., necessary to confer that benefit. And the trust instruments are

broad enough to include physical, psychic, financial, or other types of benefits.

Thus, the trustee could invade the corpus to provide Martha with funds for a business, for travel, for gifts to others, or for any other purpose deemed beneficial to her. Such purposes are not subject to predetermined measurement. Contrary to petitioner's argument, we do not think the use of the word "necessary" in this context properly can be read to limit the invasion to items needed to maintain Martha in the standard of living to which she was accustomed.

The language of decedents' trusts is similar, in principle, to that in *Newton Trust Co. v. Commissioner*, 160 F.2d 175 (1st Cir. 1947), affg. on this issue *Estate of Cutler v. Commissioner*, 5 T.C. 1304 (1945), where the decedent's will gave the trustee power "to make such payment or payments to or for the use and benefit of my said wife as it may in its sole discretion, deem advisable." Massachusetts law controlled the interpretation of the will, and the court said (160 F.2d at 179):

"Use and benefit" considered conjunctively or disjunctively connote considerably more than the maintenance of a standard of living and to our mind payments for such a purpose or purposes could not lend themselves to predetermined measurement or a measureable standard. * * * Undoubtedly a court of equity would disallow certain expenditures from principal under the terms of this trust which expenditures might readily be allowed where the broader terms were used. But within the area of permissible principal invasions here, it is impossible to predetermine just how much would be expended for "use and benefit" or even to set a dollars and cents maximum. The term "benefit" has been said to mean "whatever promotes welfare; advantage, profit." * * * This alone should serve to point out the indefiniteness of the terms here employed. [Citations omitted.]

See also *Old Colony Trust Co. v. Commissioner*, 423 F.2d 601, 604 (1st Cir. 1970) ("best interests"); *Zentmayer's Estate v. Commissioner*, 336 F.2d 488, 490 (3d Cir. 1964) ("for any other purpose which my trustees shall deem expedient, necessary or desirable for the benefit or use of my said sister"); *State Street Bank & Trust Co. v. United States*, 313 F.2d 29, 31 (1st Cir. 1963) ("reasonable requirement"); *National Bank of Com. of San Antonio v. United States*, 369 F.Supp. 990, 992 (W.D. Tex. 1973), affd. per curiam (5th Cir., Mar. 8, 1974).

The case of *Pittsfield National Bank v. United States*, 181 F.Supp. 851, 852 (D. Mass. 1960), on which petitioners rely, is distinguishable. In that case, the beneficiary was to have "all or

such part of the principal * * * as he may from time to time request, he to be the sole judge of his needs." The court found that this power to invade corpus was limited to the beneficiary's needs and was thus related to the beneficiary's accustomed standard of living. But the word "needs," used in the trust in that case, was much more limited and specific than the word "benefit," used in the instant trusts.

In summary, we conclude that the two trusts here in dispute did not qualify the remainder interests given the six designated charities for charitable deductions under pre–1969 law. Such interests were not severable from the interest given Martha and hence their value was not accurately calculable at decedents' deaths. Since those remainder interests were not so qualified at the time of decedents' deaths, the post-death reformation of the trust instruments did not render such interests deductible.

To reflect the foregoing,

*Decisions will be entered for the respondent.*